Good morning, Your Honors. Damian Schiff for the Appellant's Home Builders Association, Northern California et al. And with the Court's permission, I'd like to reserve just three minutes of my time for rebuttal. The listing of the California tiger salamander is illegal for three reasons. First and most important, it's illegal because the Service has failed entirely to explain why the tiger salamander qualifies as a threatened species under the Endangered Species Act. The Service identified a number of threats, but made no attempt to quantify or qualify how those threats translate to threatened status under the ESA. Secondly, the listing is illegal because the Service has... Wait a minute. Is this the argument that the Fish and Wildlife Service has not quantified the amount of habitat necessary for the salamander in the areas involved, and therefore whatever finding it made that the salamander was threatened does not proceed on a rational basis? That's part of it, Your Honor. The argument doesn't have to focus just on habitat, but that is a good example... So there are five factors. Correct. Habitat is A. Correct. And C is predation. Correct. But you're saying that the Fish and Wildlife Service did not explain why it considered the salamander threatened. It did. It said the salamander was threatened because of a lack of... I don't know if this makes sense, an increasing lack of habitat or decreasing availability of habitat. Correct, Your Honor. The Service did say that the salamander has lost habitat and will lose habitat into the future. But the same thing can be said about almost every other species. The thing is that it is not enough simply to state that there is the anticipated continued loss of habitat. Rather, in addition to saying that, that is, in addition to identifying the risk factor, in this case, habitat loss, the Service has to explain how the expected habitat loss is going to result in threatened status. Especially here, that's crucially important, where you have a species that has, at present, over 900,000 acres of occupied habitat throughout the state and over 700 breeding sites, at least. Didn't the Fish and Wildlife Service cite to historical studies showing that on observation of salamanders, where there was development, there were fewer salamanders? Yes, and again... What more do you want? Your Honor, it is not enough simply to say that where there is a development, the salamanders there will have a more difficult time of existing. It's not enough simply to say that where you have predators, there will be individual salamanders taken. Rather, what has to happen is, in addition to identifying the threat, whether that be a threat from development, whether that be a threat from hybridization, whether that be a threat from predation, the Service then has to explain how those identified threats lead to the conclusion of threatened status. Again, here, it's especially important when you consider that there are over 100,000 acres of habitat in the state, salamander habitat, that are already protected to some degree. It is important, not just simply for the sake of clarity that the Service explain what it does, but also for the sake of the regulated community. Because if there is no standard by which one can judge if a salamander is threatened, then there is no standard by which you can judge whether the salamander will ever be recovered. Is it your submission that the Fish and Wildlife Service should say, should make a determination that 900,000 acres are not necessary to the salamander? The salamander can thrive on 400,000 acres? Is that your idea? Your Honor, it's not our intention to hamstring the Service to any particular analysis, but as an example, what the Service could say is, the salamander has, at present, x acres of habitat. We anticipate that it will lose a certain amount of habitat into the future. And at that point, when it has lost that y amount of acres, it will then reach a critical mass of habitat, such that it will be an endangered species, and thus now qualifies as threatened. So you're saying that unless the Fish and Wildlife Service is prepared to come to, I suppose you'd say, a range of the salamander in its present numerosity, it cannot make a decision that the removal of certain acreage will threaten the salamander? Your Honor, yes. If the Service were not to do that, then it's simply stating threats, but not explaining why those threats lead to threatened status. The same thing, for example, can be said with respect to any other species. It's perfectly reasonable to expect a species to lose habitat, and yet still to thrive, because there is a certain core amount of habitat that, for whatever reason, will never be developed, will never be threatened, will never cease to exist. And therefore, although the range of the species in the future might be reduced, one could still say with certainty that, notwithstanding the habitat loss, the species will never go extinct. Let me continue with my line of questioning. Is there any case which you can cite to us which tells us that the Fish and Wildlife Service you can use some other animal if you'd like, must determine a minimum percentage of habitat loss, a minimum remaining amount of habitat that is necessary for the species not to be threatened? No, Your Honor, there's no case I know of that is habitat-specific, but in terms of what the Service's obligations are under the ESA and the Administrative Procedure Act, that's certainly clear, and the case law is clear, that it is not enough simply to recite the conclusion. It's not enough simply to rely upon agency expertise. Rather, the agency, here the Service, has to explain why its decision is supported by the facts found. The Center and the Service have cited the Kern County case to support their position regarding that was a challenge to an endangered shrew. There, though, this Court made clear that what the Service had done was precisely what has not been done here, that is, a reliance upon data and agency explanation. And there the Service said that, well, it makes sense, you only have, say, thirty or so of these individual species or individuals within the species left. It makes sense that with so few species, individuals, that endangerment or extinction is in the offing. Here, though, the only attempt, or I should say, the only thing the Service has done is to say that here's a species that is losing habitat at a certain rate and that is subject to predation and is subject to hybridization. So the Service has identified threats. But the Service does not explain why the quantity or quality of those threats justifies threatened status. If it were enough simply to identify threats, then there would be only a one-step analysis in the listing process. That is, the Service would simply say, here's a candidate for listing that is losing habitat. Job done. I'd say more than that. They say the projected status of the species in the foreseeable future after review of the threats from habitat-related and other factors. So they're projecting a decrease in the number of the species based on the lack of habitat and other factors. What's wrong with that? What more can we ask them to do? Your Honor, there is nothing wrong with projecting habitat loss into the future because that's precisely... Species loss in the future because of lack of habitat. Right. There is nothing wrong with that, Your Honor. We don't have a disagreement with that because that is what the ESA requires. That's basically identifying a threat. You're saying, or the Service is saying, that the species is losing habitat. That's going to translate to fewer salamanders. So therefore, that is a threat. But our argument, Your Honor, is that it's not simply the fact that we can anticipate that there may be fewer salamanders in the future that leads to listing status. There has to be some explanation as to why a loss of the salamanders that are anticipated to be lost will lead to threatened or endangered status. Because I think we can all agree that one can envision a species that has a certain population size, that has a certain cushion, that can lose a certain amount in that population and yet still be able to reproduce and be able to survive. But you say that the Fish and Wildlife Service has to do two things. First, it has to determine how many salamanders there need to be so that the salamander does not become threatened or endangered. And second, the amount of habitat that will produce that amount of salamanders. It has to do two quantifying explanations for you. Well, Your Honor, I don't want to hamstring the service to say that in all cases it must use habitat as a proxy or in all cases it must try and count the number of species. That's not the argument. The argument is simply, the overarching argument is there must be explanation. In this case, the service has chosen to go the route of habitat as the primary habitat loss into the future as the primary threat on which the listing is based. So given that that is the service's choice, then it behooves the service to explain why the amount of habitat that is expected to be lost does lead to the conclusion of threatened status. Because it's not, our position is that the service cannot simply say that a loss of 100,000 acres per se justifies listable status. Obviously, if you had a species that only had 100,000 acres, then if you projected all of its habitat is going to be gone in 40 years, clearly that is a species that is endangered. But if you have a species that has a million acres of habitat and you could only project a loss of 100,000 acres, only 10 percent, then in that instance I think it's fair to say that that species would not be nearly as threatened or endangered. But I assume you're not just arguing for a quantitative analysis. And I'm having a hard time understanding what exactly you want the service to do beyond a quantitative analysis. If there's no, like, given percentage of habitat that's okay to lose, how do you envision that they would make an analysis of whether a loss of habitat or the existence of predators or any of these other factors amounts to a threatened species? What kind of evidence? Part of the problem, Your Honor, is that we, the non-experts, are simply pointing to the fact that the experts have failed to make any expert judgment or any expert explanation. Rather, the service has simply stated the conclusion and referenced figures relating to habitat and other factors. But specifically in answer to your question, Your Honor, the service doesn't have to go a particular route. It doesn't have to always base its listing on habitat loss. It doesn't have to base its listing on hybridization or what have you. Here it has. But in addition to identifying those threats, which for the sake of this appeal we don't disagree with, the service has to go one additional step. And if the service doesn't know how much habitat the salamanders need, doesn't know how much hybridization threat is seriously injurious to the salamander, then the service can't act. Basically, the service would then be presuming threatened status and requiring the regulated public to show the contrary. But the service cannot presume that a species is threatened when it is the one proposing the rule. Rather, the burden is on the service to show that it is threatened. And without having any guidelines or any standard as to how much habitat loss in this case, how much hybridization translates to threatened status, then the service can't simply act because the service cannot make a reasoned decision. And my understanding is that this would reduce the habitat by 26 percent. Is that correct? Your Honor, I'm not certain about that precise figure because, in the record, some of the figures are based upon certain types of habitat. But, yes, Your Honor, there is expected to be habitat loss. There already has been 75 percent of habitat loss, leaving 20 percent that would exist for the Central Valley salamander. You're correct, Your Honor, that something along three-quarters of the original habitat of the salamander has been lost. But the service of court, of course, is forbidden, and the service concedes that it cannot base the listing simply because there has been a certain amount of habitat lost in the past for two reasons. First of all, for the legal reason that that is not a permissible factor for listing. For the practical reason in that ---- It would be a permissible factor to determine the significance of the new habitat reduction. Correct, Your Honor. Past habitat loss is relevant for the purpose of predicting future habitat loss. But the practical problem with looking just at past habitat loss is that since the arrival of man on this continent, almost every species, I would think, has seen a reduction in its habitat, and some more than others. Notwithstanding that fact, many species continue to thrive because there is a cushion in habitat. And the point here is we, and when I say we, the appellants, don't know whether there's a cushion left for the salamander. There may not be a cushion left for the salamander in terms of habitat, but there may be. The point is, though, that the service has the obligation to explain whether there is a cushion, because if not, if there is no cushion, then there should be a listing. If there is a cushion, then there may not have to be a listing. And therefore, the service's burden is to explain. Here, we contend that the service has not explained. If the Court has no further questions, I'd like to reserve the balance of my time, please. Thank you. May it please the Court, I'm Catherine Barton for the government, and with me is Ms. Cassie Siegel, who's with the Intervenors Center for Biological Diversity. I'm planning to take 15 minutes, and she will take five. At least that's my plan. Or less, if you care not to hear from us that much. So the Endangered Species Act, could I just answer questions or launch into my? Go ahead. The Endangered Species Act charges the Secretary with implementing the Endangered Species Act and with determining whether species are endangered or threatened by applying the agency's special scientific expertise. This is the circumstance where the courts are to be most deferential to agency determinations. And that deference is clearly warranted here, where the agency evaluated, looked at the best available scientific data as required by the Endangered Species Act. The home builders don't disagree with that, that the service looked at all the best available data. Suppose that the whole project of the Association of Builders was 10 acres. If you had made a decision that the removal of 10 acres of habitat for the salamander threatened the salamander because it only had 890,000 remaining acres, your position would be the same as it is here? The. No. I mean, actually, that's true. It couldn't be. So therefore, isn't what the appellant saying have doesn't have some ring of reason to it. That before you can say that the species is threatened, you have to determine two things. One, how many of the species are necessary so that they will have a chance of surviving in the future? And two, how much acreage that species requires. How can you get around those two findings? Well, first of all, Your Honor, the Endangered Species Act regime requires the agency to determine, upon receiving a petition for a listing of a species, to make a determination within a year and based on the best available scientific data. There isn't any data on how many salamanders are enough. There isn't data on how much habitat is enough. In fact, in this context, those questions don't exactly make that. It's not how much habitat there is. It's the condition of the habitat, the quality of it, the interplay with the threat from genetic hybridization and predation. We don't have the data on what's going to happen. If there is no data on those two issues, how many salamanders are necessary to continue having salamanders in California, nor how much land they need to thrive, how can you come to the conclusion the salamander is threatened by the removal of any habitat? Well, I'll talk some more about the record in a minute, but let me just say that the secretary must decide threatened or not, to list or not to list, and there isn't a bias in one direction or the other. The secretary does not have a choice of not listing the species because there isn't enough data. The secretary has to look at the data and determine whether listing is the decision as bad as should be listed or not listed. Does it seem that the species is going to be okay? Has it arrived to the point? On the issue of listing or not listing, besides the salamander. There's no burden. There's just a statutory regime and then the secretary to apply the scientific expertise. We would say there's no meaning one way or the other. You're saying that if the hearing opens to list the salamander and there's no evidence available of how many salamanders are needed to ensure the non-extinction of the species and there's no evidence submitted regarding the acreage is necessary for the salamander to not be extinct and you close the record as soon as you've opened it, the secretary can make a listing with absolutely no evidence. I don't know. It must do so. That hypothetical, no. The secretary has to take all the scientific data. And let me explain here. But there is none. According to you. No, no, no, no, no. According to what you told me, there is absolutely no data of how many salamanders are necessary so the breed won't die out. Step two. There's absolutely no data of how much habitat is needed for those salamanders not to die out. Right. But nonetheless, the secretary must list. Let me explain what this record shows and why the decision is eminently reasonable. And, in fact, we would be sued and lose if we hadn't made this decision on this record by my co-counsel in this case. There is a downward trajectory in this species. There has been in the past a tremendous downward trajectory based on habitat loss, fragmentation, and modification. We're not just talking about how much acreage, but whether if you lose a vernal pool, all the acreage associated with that vernal pool in this analysis is gone. These populations, they form what's called a metapopulation, where the pools need to be in proximity to each other so that there is an exchange of species. All of this is in the record. If you lose one of those, you threaten that community. It's a very complicated analysis. So the habitat is going down in both quantity and quality. And it's becoming fragmented. And when that happens, it might not matter how much you have. You have a little isolated population here. Then coming in sort of a vector from another direction is the genetic hybridization, which is happening in three of the four areas in which the salamanders are found. The Central California tiger salamander that's at issue here are found in the state. And predation of non-native fish, if you have ponds that are especially stock ponds, where most of the species now are relegated to artificial stock ponds, dependent on ranchers' management regimes for how those stock ponds are managed. If those stock ponds are year-round, then they often become colonized by predators. So you've got these three downward, three really heavy factors impinging on the fish. They've caused, I mean, on the salamander, they've caused the decline to this date, and there's no evidence that they are baiting in the future. The evidence, all the trajectories, all the predictions, all the data they have shows a continued downward curve with actually no countervailing factors to stop the curve. Do you have any areas? Is there any data of areas where the salamander is not threatened by any of these actions? In other words, where there is no development, where there is no hybridization, and what's the third one I've forgotten? The predation. Predation. By non-native species. And how the salamander thrives or doesn't thrive. Perhaps, perhaps the salamander is just doomed to extinction even in the best of circumstances. The salamander, that could actually be the case, given the genetic hybridization. What you're telling me is that anything could be the case, but we have to make a listing. We don't have any data. We know the salamanders are on a downward trajectory as far as numbers are concerned, but we don't know how many we have to keep in order to guarantee the survival of the species, and we don't know how much land those surviving ones need, but we have to list it anyway because we have fewer salamanders today than we had before. If that were so, then the loss of 10 acres years ago should have brought the ruling by the... Your Honor, we agree that we cannot base a listing on the past. We have to look at what is happening to the species, its potential to exist in the future, and it is the inexorable downward slide, the curve of the species going down with nothing to stop it, except there is in the record a few protected areas, and the service explains why these protected areas that exist so far are not sufficient. The discussion of the protected areas is in a couple locations, but I have one at the Joint Supplemental Appendix that we submitted on page 267 in the Federal Register Notice. Many of them are not focused specifically on the Central California tiger salamander, so there is general habitat protection, but they are protected in with national wildlife refuges or other East Bay Regional Park has a number of tiger salamanders. There is still genetic hybridization problems in at least a quarter of those areas so far, and there are non-habitat-related threats, the non-native species. There are still problems with road crossings, environmental contaminants. So clearly even the home builders haven't suggested that there is any data to show that the existing areas are sufficient. So at this point, and there's no regulatory regime. They've looked at the adequacy of the existing regulatory regimes. We're just on a downward curve and continuing to go down with nothing to stop it. I mean, that's the other reason that what would help? It would give us no information in a sense to know how many salamanders were necessary, because unless we do something about it, we're not going to be able to reach that point. Were the loss of salamanders due from hybridization to that due to lack of habitat? I'm not sure what you're asking. Hybridization is nothing other than what Professor Darman called natural selection. Oh, no, no. Hybridization is genetic hybridization with non-native tiger salamanders introduced from out-of-state in the mid-1950s as bait. And so it is a hybridization with a non-native species in which we are losing the genome. And there are a number of listings that have happened in the past and examples of species being endangered or extinct based on the loss of the genome. I mean, that is clearly part of what the Endangered Species Act is intended to preserve is a species genome. So that is not a natural process. That is an introduction with these probably more robust also tiger salamanders that seem to tend to live more robustly in the ponds. This development of the area doesn't introduce any of these foreign salamanders, does it? Well, no. You're not accusing the home builders of importing foreign salamanders, are you? No, no. But we don't actually know why the hybridization occurs in different areas. The record also explains at our joint appendix at 275, it talks about the advancement of the hybrid genes over the past decade. You know, if you look at the discussion, the scientific meeting of the team is very illuminating. And it starts at our joint appendix at 194, and there are a number of charts where they identify for various threats what they think is going to happen when. And they look at the different populations as four areas, the Central Coast, the Bay Area, the Central Valley, and the Southern San Joaquin. They actually expect to, they have very serious concerns that they're going to entirely lose the Central Coast population to hybridization. The Bay Area is also infected with hybridization, and now they've just found it out in Merced recently. So the Central Valley population is... How is lack of development going to affect hybridization? Excuse me? How is lack... Suppose they develop 10,000 acres, right? Is that going to increase hybridization or decrease hybridization? Is it going to have any effect on them? Those... Actually, the problem that... No, the two are not directly related, but they work together. Let me ask you another question. One of the reasons given for your determination was that the regulatory... There was an inadequacy of existing regulatory mechanisms. Are you abandoning that issue because you used a standard of regulatory mechanism which completely protects the salamander rather than adequately protects the salamander? We did not. I think our brief is clear on that. They actually used that word on occasion, but clearly they did not. I mean, I'd like to save time for Ms. Siegel, but... I'll take a look at your brief. It's very clear in the brief. The position is that you're not abandoning that. Okay. No, no. Thank you. Good morning, Your Honors. Cassie Siegel on behalf of Interdefendant Center for Biological Diversity. First, on the issue of hybridization, when appellants make the contention that the hybridization and development threats should balance each other out, that's contradicted by the evidence in the record. Joint supplemental excerpts of record at 275. In fact, the hybridization threat is greater in highly modified habitats. Scientists suggest that this is because, number one, the introduced tiger salamander has a more flexible breeding cycle than the California tiger salamander and can therefore take advantage of perennial ponds by breeding earlier in the fall, and second, because the introduced salamander can retain its larval characteristics as an adult, again allowing it greater use of permanent water bodies. Moreover, the service stated that the sudden appearance of hybrids in eastern Merced County in May 2003 suggests that the introduced salamanders are still being moved around by humans. Habitat fragmentation by roads is clearly no barrier to the introduction of non-native species when the non-native species is being introduced by people. It makes the threat greater. I'd like to address the best available science standard, because the standard for listing is the five-factor analysis and the requirement to provide a summary of data on which the decision is based and show the relationship of the data to the listing decision. This is the standard, and it's all that the law requires, and appellants are trying to create an additional yet unspecified barrier to listing. This court considered the same issues presented here in Kern County Farm Bureau v. Allen, 450 F. 3rd, 1072. In Kern County, plaintiffs' appellants challenged the ESA listing of the Buena Vista Lake shrew on the grounds that the service had not adequately explained why the shrew qualified for listing. Specifically, appellants alleged an insufficient explanation of why the species was endangered in light of new information, which became available between the proposed rule and the final rule showing that there were more shrews over a larger area than previously known. They also alleged that the service failed to adequately answer a number of questions appellants claimed were mandatory prior to listing the species. The court rejected appellants' arguments because the service had adequately explained, in the final rule, why the reasons for the listing were still valid, despite the new information. And the court rejected, quote, Kern's attempt to mandate that the Fish and Wildlife Service answer its particular questions before making a listing decision. The Fish and Wildlife Service's discussion of the data and analysis of the extinction factors here adequately satisfied its ESA requirements. Here, just as in Kern County, the service meticulously discussed the listing factors. Nothing more was required for this listing decision to be upheld. Here, appellants say... You say that as long as they recite the listing factors, they don't have to have any evidence that the factor exists? Well, they do have to have evidence, and here they had an unbelievable amount of evidence. With your colleague, who I took a note saying, there's absolutely no data of how many salamanders there must remain in order for the species not to die out, and there's no data of how much habitat is needed for that cohort. Well, it's true that there's no study that exists that says exactly how many acres of habitat and how many salamanders need to have... What is your best scientific information that allows someone to say a loss of so many acres will threaten this species? That's an excellent question, and there's an enormous amount of information that goes to that. For example, the biology and natural history of the species explains why the species is so vulnerable to habitat loss. This is explained at JSER 4-5 in the proposed rule, and again at JSER 250-253. In order to reproduce, the salamander needs ponds to lay its eggs in. The salamanders need the winter rains, and they need the ponds to hold water long enough for the larvae to metamorphose. If the ponds dry up before the larvae grow up, they die. The salamander has very low reproductive output. Many salamanders breed only once in their lifetime. Because of this, salamander populations will, from time to time, because of natural fluctuations, become extinct, even in the absence of additional human threats. This is what's called the metapopulation dynamic. You have populations spread out over the landscape. Some of them will disappear. You need to have habitat connectivity for salamanders from one pond to recolonize another when the salamanders have disappeared there. This is the basic biology of the species that makes it so vulnerable to habitat fragmentation. That's in the record. You're out of time. Thank you very much. Thank you, Your Honors. Thank you, Your Honor. I just want to make a few short points. If you address your opponent's argument that the population of salamanders appears to be in a downward decline as a result of habitat loss, as a result of predation, as a result of hybridization, and there seems to be, perhaps, like the stock market, no bottom. Your Honor, first of all, the service and CBD have eloquently explained why there are threats to the salamander. And, again, for purposes of this appeal, we don't contest that the service has identified threats. What we do contest is that there's been no explanation as to why those threats lead to threats. And that's because there's been no evidence of threatened status, especially with, even according to the service's own numbers, which we've quoted in our briefs, only 16 percent of the salamander's current habitat is threatened by hybridization. And, further, that only 8 percent of the current habitat of the salamander falls within general plan areas that are slated for urban development. And that there are various other rings around that for low-intensity development. But the point is that the service points to threats, but cannot connect the dots. And with respect to the Kern County case that was cited to the Court, we believe that that is an excellent case for showing precisely what the service must do and what it has not done here. And specifically at page 450F3, 1081, this Court said, in reference to the service's listing, the Court said, quote, the final rule is extensively documented and contains abundant data and explanations supporting the service's ultimate decision. And the Court goes on to say that there were only 30 known shrews in existence. What would you do if you were drafting an order of reversal and remanding? What would you tell the Fish and Wildlife Service to do? To look back at the record and to explain why the anticipated loss of habitat or the anticipated predation or the anticipated hybridization of the salamander or all of those combined together support the conclusion that the salamander is a threatened species. Suppose they came back with the answer, which they have now, because those are elements which reduce the number of salamanders. Then the listing cannot be justified. It is a fundamental, and I would respectfully disagree with my opposing counsel, it is a fundamental aspect of administrative law that the proponent of a rule has the burden of proof. Here the service is the proponent of the listing. So, therefore, it must establish. That isn't enough to say the number of salamanders has decreased and we have identified three threats to the salamander, namely habitat loss, hybridization, and predation. So since you're not really responsible for hybridization, no matter how active your members are, one of them, habitat loss, is sufficient. And so we're not going to, we're going to list them as threatened species. Our response, again, Your Honor, would be, yes, the service should look to habitat. Yes, the service should look to other threats. But the service must go beyond that and explain why we don't have a situation where you have a species. They have explained it. They explain habitat loss causes decrease in numbers of salamanders. Isn't that an explanation enough? Or you have to say, ah, not enough. You have to find out how many salamanders have to be saved and what the relationship is between acre and salamander. I think, Your Honor, to use an example that may be somewhat absurd, but if you have anteaters present, you're going to have fewer ants. But I think we can all say that if we import an additional anteater into the state of California, we're not going to have an ant population that is suddenly threatened with extinction. So it's not simply enough to say that if you add a predator, there will be more prey taken. If you take away habitat, there will be less habitat for the species. That's simply reciting the threats. That's simply reciting the factors. Rather, the service must go beyond that and explain why those particular threats, given this particular species' biological needs, translate to threatened status. It may be that the salamander is threatened. It may not be, but the service has a duty to explain. Thank you, Mr. Schiff. Thanks to everybody for a very good and interesting argument. That concludes our calendar today. We stand adjourned until tomorrow morning. Thank you.
judges: Hug, Bea, Edmunds